UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STEVEN J. FRISCH,

          Plaintiff,

    -against-

LIKEOPEDIA, LLC, OMAR RIVERO, FG
LIKEOPEDIA, LLC, FG INVESTMENTS, LLC,
CHRISTOPHER FINDLATER, and TRIBEL, LLC

         Defendants.

Case No.  **1:23-cv-03904**

**COMPLAINT**

Plaintiff Steven J. Frisch ("Frisch") brings the following complaint against Defendants Likeopedia, LLC ("Liker"), Omar Rivero ("Rivero,"), FG Likeopedia, LLC ("FG Likeopedia"), FG Investments, LLC ("FG Investments"), Christopher Findlater ("Findlater"), and Tribel, LLC ("Tribel," collectively, the "Defendants") and alleges as follows:

## NATURE OF COMPLAINT

1.    Liker is an early-stage startup company which owns and operates an up-and-coming social media platform.  Liker retained Frisch as a consultant to help it transform from a nascent startup company with a fledgling product into a functional and well-run operating company with an improved and fully developed product.  Liker also retained Frisch to help Liker with its early-stage funding rounds and interactions with potential investors.

2.    In view of the fact that Liker was and is a startup company, Frisch agreed to be compensated, at first, by the issuance of equity—a 4.7% membership interest—while deferring all of his cash consulting fees in accordance with various timeframes and milestone achievements relating to Liker's success in raising a certain amount of money from investors.  Frisch also agreed to wait until D&O insurance was obtained to take a seat on Liker's Board of Directors.

3.      Liker never fulfilled its unequivocal contractual obligation to issue equity compensation, which was due, without condition, 30 days after execution of his agreement with Liker.  Frisch only discovered later that Rivero and Findlater had lied to him about Liker's issuance of those interests. Frisch only discovered later that Rivero and Findlater materially omitted information about Liker's issuance of equity.  Frisch only discovered later that Rivero and Findlater failed to disclose the terms of Liker's operating agreement, which neither of them informed Frisch even existed, and which Rivero and Findlater now claim in this litigation allow either Rivero or Findlater to unilaterally prevent Liker from issuing the promised equity to Frisch.

4.      At this time, Liker continues to owe Frisch a 4.7% membership interest which was worth approximately $470,000 to $940,000 in or around the time of the facts giving rise to this lawsuit, based on the $10 million and $20 million valuations Rivero and Findlater were representing to other investors (plus the contractual tax gross-up) around that time.  However, a 4.7% interest is believed to be worth much more as of the date of this Complaint.  Rivero and Findlater have unilaterally failed to cause Liker to issue these shares by the terms of the undisclosed operating agreement, to their own personal benefit and Frisch's detriment.

5.      Upon hitting the benchmarks that triggered Liker's cash payment obligations, Liker also refused to pay Frisch the deferred cash compensation.  At this time, Liker owes Frisch *at least* a principal monetary amount of $352,500.00, plus a tax-gross up obligation on these monies and the share issuance, which gross-up is worth hundreds of thousands more.  Liker has also failed to satisfy other contractual promises.

6.      Rivero is the manager of Liker and Liker's majority member, and has caused Liker to breach its monetary and non-monetary obligations to Frisch.  Rivero also participated in the negotiations with Frisch and made various misrepresentations, and omitted various pieces of

material information, relating to Liker's issuance of securities to Frisch.  Rivero thereby committed common law fraud and securities fraud violations.

7.     Findlater is an indirect investor in Liker, and also participated in the negotiations surrounding Frisch's agreement with Liker, including conversations in which he made various misrepresentations, and omitted various pieces of material information, relating to Liker's issuance of securities to Frisch.  Findlater thereby committed securities fraud violations personally and on behalf of FG Likeopedia LLC and FG Investments, LLC.

## PARTIES

8.     Frisch is an individual who currently resides in Hudson County, New Jersey.  Frisch resided in New York, New York at all times relevant to this litigation, including when his agreements with Liker were negotiated and when he provided the services to Liker.

9.     Liker is a Florida limited liability company with a principal place of business, at various relevant times, in California and/or Florida.

10.    Rivero is an individual and the majority member of Liker.  Upon information and belief, Rivero resides in Florida.

11.    Findlater is an individual residing in Florida.  Findlater is an indirect investor in Liker, through two LLC's which, upon information and belief, he controls: FG Likeopedia and FG Investments.

12.    FG Likeopedia is a Delaware limited liability company with, upon information and belief, a principal place of business in Florida.  FG Likeopedia is an "Investor Member" in Liker.

13.    FG Investments is a Delaware limited liability company with, upon information and belief, a principal place of business in Florida.  FG Investments is the managing member of FG Likeopedia, and Findlater is the manager of FG Investments.  Findlater signed Liker's operating agreement on behalf of these entities.

14.     Tribel is a Florida LLC to which, upon information and belief, Rivero and/or Findlater transferred all or a significant portion of Liker's assets after commencement of Frisch's state court litigation (as described *infra*).

## JURISDICTION AND VENUE

Personal Jurisdiction

15.     Liker is subject to personal jurisdiction in New York by virtue of the fact that it solicited Frisch's services in New York, its agreements with Frisch were negotiated, in whole or in part, in New York, and because Frisch provided services to Liker, in whole or in part, in New York.  Liker also does business in New York.

16.     Rivero is subject to jurisdiction in New York because his actions were directed toward Frisch, who at the time was an individual residing in New York.

17.     Findlater, along with FG Likeopedia and FG Investments, are subject to jurisdiction in New York because Findlater's actions (individually and on behalf of FG Likeopedia and FG Investments) were directed toward Frisch, who at the time was an individual residing in New York.

Subject Matter Jurisdiction

18.     This action seeks relief for violation of the Securities Exchange Act of 1934. Subject matter jurisdiction is conferred by Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa.

19.     The remaining causes of action are appropriate pursuant to 28 U.S.C. § 1367 for interrelated state law claims that arise from the occurrences giving rise to the federal claims, which have a common nucleus of operative fact.

Venue

20.     Venue properly lies in this County pursuant to 28 U.S.C. 1391(b)(2) because a substantial portion of the facts relevant to this action arose in this County, as Frisch resided in New

York County when the relevant contract was negotiated and performed, and when the relevant work was performed.

## **FACTS RELEVANT TO ALL COUNTS**

**Procedural History**

21.     On March 22, 2021, Frisch filed his original complaint in a case captioned <u>Steven J. Frisch v. Likopedia, LLC and Omar Rivero</u>, in the Supreme Court of the State of New York, New York County, bearing Index No. 651876/2021 (the "State Court Action").

22.     The original complaint in the State Court Action was later amended to include FG Likeopedia, FG Investments, and Findlater, and to remove some causes of action and add others based on information contained in affidavits submitted along with Liker and Rivero's initial motion to dismiss the original complaint in the State Court Action.

23.     On May 9, 2023, the Court issued a Decision and Order (the "Decision and Order") which adjudicated a subsequent motion to dismiss that amended pleading, dismissing Frisch's unjust enrichment claim as duplicative of Frisch's breach of contract claim, and dismissing certain Federal statutory claims over which it lacked jurisdiction.

24.     The Decision and Order ruled that Frisch had adequately pled his claims for fraud in the inducement and a violation of the New York Freelance Isn't Free Act.[1]

25.     The Decision and Order also granted Frisch's cross-motion for leave to discontinue the State Court Action *without* prejudice, so that he could instead proceed with the filing of this Complaint in this Court.

---

[1] Defendants had not moved to dismiss Frisch's breach of contract and breach of the covenant of good faith and fair dealing claims.

**Frisch's Consulting Agreement with Liker**

26.     In or about January 2020, Frisch and Liker entered into an agreement for consulting services to be provided by Frisch to Liker for the time period covering December 8, 2019 through December 31, 2020 (the "Consulting Agreement").

27.     The Consulting Agreement is attached as **Exhibit A**.

28.     The Consulting Agreement contains a provision requiring it be interpreted and enforced according to New York law.

29.     The Consulting Agreement "define[d] terms for additional consulting by [Frisch] with a general scope of work that is related to [Liker] funding, covering the period of time that commenced on December 8, 2019 and through December 31, 2020," and called for daily compensation for "each calendar day where Frisch performs work for Liker" to be paid monthly.

30.     The Consulting Agreement stated "Liker will award Frisch preferred equity in an amount equal to 4.7%. . . of Liker. . . within 30. . . days of executing this agreement."

31.     Frisch and Liker (through Rivero) executed the Consulting Agreement on January 6, 2020, and the equity compensation was therefore due on or before February 5, 2020.

32.     The Consulting Agreement does not contain any condition(s) precedent to the issuance of the equity other than execution of the Consulting Agreement.

33.     The Consulting Agreement does not contain any prerequisite(s) to the equity vesting in Frisch.

34.     The Consulting Agreement simply says "Liker will award" the equity on or before the due date (February 5, 2020).

35.     Between late December, 2019 and early January, 2020, Rivero and Findlater conducted numerous electronic correspondence with Frisch to negotiate the Consulting Agreement on Liker's behalf.

36.     Rivero and Findlater also spoke to Frisch on the telephone between December, 2019 and early January, 2020 to negotiate the Consulting Agreement on Liker's behalf.  Rivero and Frisch also met in person in both California and Florida during these negotiations.

37.     Rivero signed the Consulting Agreement on Liker's behalf.

38.     Rivero and Findlater represented, in negotiating the Consulting Agreement with Frisch, that they had the authority and ability to promise, on behalf of Liker, that Liker "will award Frisch preferred equity" in Liker.

39.     Rivero and Findlater represented, in negotiating the Consulting Agreement on Liker's behalf, that Liker would, in fact, issue the promised 4.7% on or before the due date (February 5, 2020).

40.     Rivero and Findlater, in negotiating the Consulting Agreement, did not disclose to Frisch the May 28, 2019 Amended and Restated Limited Liability Company Agreement for Liker (the "LLC Operating Agreement").

41.     Frisch first learned about the LLC Operating Agreement when Rivero attached it to an August 24, 2021 affidavit filed in support of a motion to dismiss the earlier complaint in the State Court Action.

42.     Rivero and Findlater, in negotiating the Consulting Agreement, did not disclose to Frisch the LLC Operating Agreement or any operating agreement of Liker.

43.     Rivero and Findlater, in negotiating the Consulting Agreement, did not disclose to Frisch any restrictions or limitations on Liker's issuance of equity to Frisch or to anyone else.

44.     Findlater provided Rivero with a draft of the Consulting Agreement, *inter alia*, on December 18, 2019, which Rivero forwarded to Frisch later that day, and Findlater stated to Rivero

"You [Rivero] and Steve would have to insert the equity bonus. . .  Normally there would be some part of the equity that was held back until the completion of funding."

45.    The foregoing correspondence dated December 18, 2019, from Findlater to Rivero, is important for at least two reasons:

    a.  It indicates that Rivero and Findlater were aware of *how* to draft a Consulting Agreement with conditional vesting of equity, but later caused Liker to enter into the Consulting Agreement containing no such language.

    b.  It indicates Findlater's participation in negotiations with Frisch in a transaction involving the issuance of securities to Frisch, conversations from which Findlater omitted any mention of any operating agreement for Liker or any other condition on Frisch's ability to obtain the promised membership interests.

46.    On January 7, 2021—the day after the Consulting Agreement was signed—Rivero emailed Findlater and Frisch regarding the formation of a successor entity to Liker, wherein he indicated Frisch's ownership of 4.7% of the successor entity and asks *both* Findlater and Frisch to "reply with your approval so that we can move forward with starting the new corporation."

47.    On or about February 13, 2020, Rivero made an investor presentation that represented Liker's valuation at $10M, and represented that Frisch was a Liker board member and (by implication) a holder of equity in Liker.

48.    These representations by Rivero made in connection with the February 13, 2020 presentation are consistent with Frisch's then-belief that Liker had already complied with its unconditional contractual promise that Liker "will award Frisch preferred equity."

49.    These representations are confirmation of the communications that both Rivero and Findlater had with Frisch before Frisch signed the Consulting Agreement, all of which suggested Liker would fulfill the unconditional contractual promise that Liker "will award Frisch preferred equity."

50.     Neither Rivero nor Findlater referred to any additional yet-to-be performed conditions relating to Frisch's ownership in Liker or its successor—either contained in the LLC Operating Agreement or otherwise.

51.     In all conversations and correspondence before and after the execution of the Consulting Agreement relating to Frisch's interests, Rivero and Findlater acted at all times as though the Consulting Agreement's promise that Liker "will award Frisch preferred equity" on or before February 5, 2020 would and/or did occur without further condition or action on the part of Findlater or Rivero.

52.     In all conversations and correspondence before and after the execution of the Consulting Agreement, both Rivero and Findlater omitted to disclose any information that *any* additional steps were required in order to issue the relevant membership interests.

53.     Only in the State Court Action, by way of Rivero's August 24, 2021 affidavit, did Frisch discover the terms of the purported LLC Operating Agreement.

54.     The LLC Operating Agreement purports to restrict Liker's issuance of membership interests as explained in Defendants' August 25, 2021 motion to dismiss brief:

> Liker's. . . [o]perating [a]greement. . . sets the following procedure for admitting a new member of liker:
>
>> In order for a Person to be admitted as a Member of the LLC with respect to an Additional Interest: (i) the Board (including [Findlater] and [Rivero]) shall have. . . authorized such Additional Interest, (ii) such Person shall execute a counterpart to this Agreement, accepting and agreeing to be bound by all terms and conditions hereof, and shall deliver such documents and instruments as the Board determines to be necessary or appropriate in connection with the issuance of such Additional Interest to such Person or to effect such Person's admission as a Member; and (iii) the Board shall amend Schedule A hereto. . .
>
> The documents clearly establish that Frisch was never issued a membership interest in Liker.  [E]ven if Rivero may have executed some other agreement which pledged a membership interest to Frisch, that is insufficient to grant a

membership interest under the Operating Agreement.  In addition to Rivero, another member of the Liker Board, whether it be [Findlater] or an independent member, had to also authorize the additional interest.

See State Court Action, NYCEF Doc. No. 20, p. 7.

55.     In other words, Defendants have already explained to the New York State Court that even though Rivero and Findlater participated in negotiations with Frisch for the Consulting Agreement—which stated Liker "will award Frisch preferred equity"—both Rivero and Findlater surreptitiously retained the ability to cause Liker *not* to "award Frisch preferred equity."

56.     The LLC Operating Agreement, as well as Rivero and Findlater's unilateral ability to withhold the promised equity notwithstanding Liker's unconditional promise to award the equity, were material to Frisch. Frisch justifiably relied on the promise of Liker's unconditional award of equity in entering into the Consulting Agreement and providing consulting services to Liker, from which the owners of Liker—Rivero and Findlater—benefited.

**Liker's Breach of the Deferred Consulting Fee Provisions in the Consulting Agreement**

57.     The Consulting Agreement called for payment by Liker to Frisch of "a consulting fee of $7,500 . . . per day for each calendar day where Frisch performs work for Liker."  This payment was to be made on or before the seventh day of each month, but was "deferred until at least $500,000 . . . in funding is raised by [Liker], at which point all deferred cash consulting fees will be paid to Frisch by Liker within seven calendar days of such funding."

58.     The Consulting Agreement's promise to compensate Frisch for each day he performed consulting services was not conditioned on Frisch completing a certain number of days, months, or years of consulting services for Liker.

59.     Frisch performed consulting services for Liker under the Consulting Agreement[2] beginning in December 2019 and continuing to and through April 4, 2020.

60.     During the time period of December, 2019 through March 2, 2020, Frisch performed forty-seven (47) days of consulting services for Liker, amounting to deferred consulting fees of $352,500.00 plus the applicable tax gross-up that is also Liker's responsibility.

61.     Rivero confirmed via email dated March 4, 2020 that this was the amount Liker then owed to Frisch in deferred consulting fees as of March 2, 2020.

62.     Frisch continued to perform consulting services for Liker through at least April 4, 2020.

63.     Frisch did not send additional correspondence about additional amounts owed after March 2, 2020 because on or around April 4, 2020 Rivero indicated by phone that Liker would not pay the deferred compensation.

64.     Frisch performed consulting services on every day that Rivero (or anyone else on Liker's behalf) requested that he do so.

65.     After April, 2020, neither Rivero nor any other representative of Liker requested any further consulting services from Frisch.

66.     Frisch remained available to perform consulting services to Liker on every day thereafter through the end of the time period referenced in the Consulting Agreement, which "cover[ed] the period of time that commenced on December 8, 2019 and through December 31, 2020."

67.     In 2020, Liker received more than $500,000 in funding, triggering Liker's obligation to pay Frisch his deferred compensation within seven (7) calendar days.

---

[2] Frisch provided consulting services to Liker in November, 2019 which were not covered by the Consulting Agreement at issue here.

68.     Specifically, Liker received a commitment to provide $1,000,000 in funding which, upon information and belief, was consummated through a series of payments commencing in late March or early April 2020, and further payments thereafter.

69.     Liker did not pay Frisch any of the $352,500.00 (plus applicable tax gross-up) in deferred compensation which Rivero had confirmed Liker owed Frisch through March 2, 2020.

70.     Liker did not pay Frisch any of the deferred consulting fees accrued for work after March 2, 2020.

71.     Liker has therefore breached the deferred consulting fee provisions of the Consulting Agreement.

**Liker's Breach of the Equity Payment Provisions of the Consulting Agreement**

72.     The Consulting Agreement required Liker to issue to Frisch 4.7% preferred equity interest in Liker within thirty (30) days of execution of the Consulting Agreement.

73.     The Consulting Agreement was executed on January 6, 2020.

74.     The 4.7% preferred equity interest in Liker was due to Frisch on or before February 5, 2020.

75.     To date, Liker did not issue the 4.7% preferred equity interest to Frisch (and did not pay the applicable tax resulting from the transfer on Frisch's behalf).

76.     Liker has therefore breached the provisions of the Consulting Agreement requiring payment to Frisch of membership interests.

**Liker's Breaches of the Board Seat Provisions of the Consulting Agreement & the Duty of Good Faith and Fair Dealing**

77.     The Consulting Agreement called for Frisch to assume a seat on Liker's Board of Directors until December 31, 2021, for no additional compensation, once appropriate D&O insurance had been obtained by Liker.

78.     Liker could have, but upon information and belief has not, obtained the appropriate D&O insurance required by the Consulting Agreement to trigger Frisch's position on Liker's Board of Directors.

79.     Rivero represented to potential investors that Frisch was, in fact, on Liker's Board of Directors.

80.     Liker now takes the position that Frisch was never given a position on Liker's Board of Directors.

81.     Rivero has caused Liker to expend monies on items other than appropriate D&O insurance to his own personal benefit and to the detriment of Liker and Frisch.

82.     As a result, Rivero has caused Liker to breach the covenant of good faith and fair dealing insofar as it has failed, without legitimate justification, to fulfill a condition precedent to Frisch's assumption of a role on Liker's Board of Directors, thereby depriving Frisch of the benefit of his bargain made through the Consulting Agreement.

83.     As a result, Rivero has also frustrated the legitimate and reasonable expectations of Frisch as to his minority ownership interest in Liker, *inter alia*, his assumption of a seat on Liker's Board of Directors and accompanying ability to guide the direction of Liker.

**Liker's Breaches the Work-Product Provisions of the Consulting Agreement**

84.     All work-product produced by Frisch under the Consulting Agreement is owned by Frisch until and unless "Liker fulfills its obligations to Frisch by fully paying all cash consulting fees, equity, and [travel and expenses]."

85.     Frisch expressly retained the full ownership of the work product he produced while performing consulting services for Liker until Liker fulfilled its obligations to Frisch and granted to Liker exclusive use rights unless and until it breached the Consulting Agreement.

86.    In the event Liker defaults in its obligations to Frisch, the Consulting Agreement calls for immediate suspension of Liker's right to use Frisch's work-product.

87.    Liker has defaulted on its obligations to Frisch.

88.    Liker used Frisch's work product to raise funding, including the funding which triggered Liker's obligation to pay Frisch's deferred fees.

89.    Liker, upon information and belief, continues to utilize Frisch's work-product to raise additional funds, and for other purposes, in violation of the Consulting Agreement.

90.    As a result, Liker has breached the Consulting Agreement.

**Liker's Fraudulent Transfers to Tribel**

91.    Upon information and belief, Tribel became the to-be-formed entity which Rivero referenced in his January 7, 2021 email to Frisch and Findlater wherein he referenced a successor entity to Liker, and asked *both* Findlater and Frisch to approve moving "forward with starting the new corporation."

92.    Rivero is listed as "Founder" of Tribel on Wefunder, a crowdfunding platform designed to match investors with businesses seeking investment.

93.    Whatever the original purpose of forming a new entity, upon information and belief Rivero and Findlater later realized—after improperly deciding not to pay Frisch or award him equity—that they could use the formation of the new corporation to improperly avoid Liker's obligation to Frisch.

94.    To effectuate this plan, upon information and belief, Rivero and/or Findlater formed a separate business entity called "Tribel LLC."  Alternatively, "Tribel LLC" is a "d/b/a" name for Liker, though this is unclear from multiple confusing public references to Tribel LLC as a separate entity, including but not limited to the following.

95.     On or about September 23, 2021, almost exactly six months after Frisch first filed his complaint in the State Court Action, Likeopedia, LLC filed a trademark application with the United States Trademark Office for the word mark "Tribel" under the International Class 045 and U.S. Classes 100 and 101.

96.     The description of the mark states that it will be used for:

Online social networking services provided through a website; Providing on-line computer databases in the fields of social networking and social introduction; Providing social services, namely, social networking services in the field of adventure, auto, books, business and economics, charities, environment, family, fantasy sports, fashion, arts, food, gaming, health, home and garden, legal, entertainment, music, politics, religion, science, academia, sports, public and community, technology and travel

97.     This indicated that Rivero and findlater sought to continue Liker's business under a new alter ego named "Tribel."

98.     The address listed under "Owner" on the trademark application for the word mark "Tribel" is 8510 SW 149th Ave, Apt 1109 Miami, Florida 33193 (the "Lago Del Rey Condominium").

99.     Upon information and belief, the Lago Del Rey Condominium is associated with Rivero, whose mother, Nina Rivero, received the Lago Del Rey Condominium by special warranty deed on November 17, 2006, from his parents, Nina Rivero and Francisco Rivero.

100.    The description for "Tribel" is essentially the same as the description of the word mark "Liker", filed on September 18, 2018, under the same International Class and U.S. Classes:

IC 045. US 100 101. G & S: Online social networking services provided through a website; Providing on-line computer databases in the fields of social networking and social introduction; Providing social services, namely, social networking services in the field of adventure, auto, books, business and economics, charities, environment, family, fantasy sports, fashion, arts, food, gaming, health, home and garden, legal, entertainment, music, politics, religion, science, academia, sports, public and community, technology and travel.

101.    The address listed under "Owner" for the word mark "Liker" is the Lago Del Rey Condominium, the same address listed for the word mark "Tribel".

102.    Upon information and belief, rather than continue to do business under the "Liker" banner and honor the contracts Likeopedia made with Frisch, Rivero and Findlater apparently started anew under the word mark "Tribel" without first creating Tribel (the entity), instead of filing the trademark application for the word mark "Tribel" with Tribel (the entity) as the trademark owner.

103.    Other public-facing documents indicate that Rivero may later have formed a separate entity called "Tribel LLC."  For example, through the date of filing this Complaint, the Apple App Store—the avenue to download the Tribel smartphone application on iPhones— continues to list the company publishing the Tribel app as "Likeopedia."  However, the Google Play Store—the avenue to download the same application on Android-based phones—lists "Tribel LLC" as the publisher.

104.    On November 13, 2020, Tribel LLC's website updated its privacy policy, but in the definitions section, the privacy policy still defines "Company" as referring to Likeopedia LLC.

105.    As of the date of this Complaint, one page of Tribel's website containing the privacy policy continues to define "Company" as "Likeopedia LLC" which is referred to as the company responsible for "your information under this Privacy Policy."  The Apple App Store links to this page.  However, another page of Tribel's website containing a similar privacy policy—the page to which the Google Play Store links—has a privacy policy that defines "Company" as referring to "Tribel LLC."

106.    Based on these public-facing documents, upon information and belief, Rivero and/or Findlater and Findlater's entities formed Tribel for the purpose of transferring Liker's

intellectual property and other assets to Tribel, which transfer was intended to improperly avoid Liker's creditors, including Frisch, and particularly to avoid sharing equity with Frisch.

## **COUNT ONE**
(Violations of Section 10(b) of the Securities and Exchange Act and Rule 10b-5)
(as against all Defendants)

107.    Frisch incorporates by reference the allegations above as if fully stated here.

108.    The Consulting Agreement constituted sales of securities by Liker to Frisch. Specifically, equity interests in Liker constitute securities, and the Consulting Agreement's promise to issue equity interests in Liker in exchange for Frisch's services is a transaction involving the sale of securities.

109.    At the time Defendants solicited Frisch to enter into the Consulting Agreement, they made material misrepresentations and omissions to Frisch as outlined above.

110.    Defendants had actual knowledge of the misrepresentations and omissions to Frisch.

111.    Those misrepresentations and omissions were made knowingly or recklessly for the purpose of inducing Frisch to enter into the Consulting Agreement.

112.    Frisch justifiably and reasonably relied on the Defendants' misrepresentations in entering into the Consulting Agreement.

113.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Securities and Exchange Act and Rule 10b-5 promulgated thereunder.

114.    As a result of Defendants' misrepresentations and omissions, Frisch has been damaged in an amount no less than the value of the promised securities, plus costs and interest.

## **COUNT TWO**
(Violations of 10(b) of the Securities Exchange Act and Rule 10b-5)
(Against Defendants Liker, FG Likeopedia and FG Investments)

115.    Frisch incorporates by reference the allegations above as if fully stated here.

116.    At all relevant times, Rivero and Findlater were agents of Liker and/or FG Likeopedia and/or FG Investments (the "Company Defendants").

117.    The Company Defendants were required to supervise the conduct of their officers and directors and their solicitations of investors.

118.    The Company Defendants knew or should have known of the fraudulent conduct of Rivero and Findlater described above.

119.    The Company Defendants benefited from the fraudulent conduct of Rivero and Findlater described above.

120.    The actions and/or inactions of the Company Defendants in supervising Rivero and Findlater caused Frisch significant financial loss in an amount to be determined at trial.

## COUNT THREE
### (Violations of Section 20(a) of the Securities Exchange Act)
### (Against Defendants Liker, FG Likeopedia and FG Investments)

121.    Frisch incorporates by reference the allegations above as if fully stated here.

122.    At all relevant times, the Company Defendants possessed, directly or indirectly, the power to direct and control Rivero and Findlater, and acted as a control person of Rivero and Findlater within the meaning of Section 20(a) of the Securities Exchange Act.

123.    The Company Defendants knew or should have known that Rivero and Findlater were engaged in fraudulent conduct, but failed to take steps to prevent their violation of the securities laws.

124.    The Company Defendants were a culpable participant in the fraudulent conduct by Rivero and Findlater.

125.     By reason of the foregoing, Frisch is entitled to judgment for damages, in an amount to be determined at trial, against the Company Defendants.

**COUNT FOUR**
**(Breach of Contract)**
**(as against Defendant Liker)**

126.     Frisch incorporates by reference the allegations above as if fully stated here.

127.     Liker entered into a binding contract with Frisch, namely, the Consulting Agreement.

128.     Frisch performed all of his obligations under the Consulting Agreement.

129.     Liker's actions and inactions breached its obligations under the Consulting Agreement.

130.     Liker is in default of its obligations to Frisch under the Consulting Agreement.

131.     As a result of Liker's breaches, Frisch has been and continues to be damaged, in the amount of (i) $352,500.00 plus taxes, legal fees and interest; (ii) his entitlement to issuance of 4.7% equity interest in Liker worth *at least* $470,000 to $940,000, based on the $10 million and $20 million valuations Rivero and Findlater were representing to other investors (plus the contractual tax gross-up), which is believed to be worth much more as of the date of this Complaint; (iii)  his entitlement to a seat on Liker's Board of Directors; and (iv) his entitlement to control his own work-product in the event of Liker's default of its obligations.

132.     In addition to the monetary and non-monetary principal amounts due Frisch under the Consulting Agreement, Frisch is also damaged as a result of Liker's breach in amounts which include any taxes which may be owed on amounts Liker is ordered to pay Frisch; for pre- and post-judgment interest; for Frisch's attorneys' fees and costs of suit; and for such other costs and fees as may arise from Liker's breaches.

## COUNT FIVE
### (Breach of the Covenant of Good Faith and Fair Dealing)
### (as against Defendant Liker)

133.    Frisch incorporates by reference the allegations above as if fully stated here.

134.    New York law implies a covenant of good faith and fair dealing in all contracts, including the Consulting Agreement.

135.    The covenant requires that each party to a contract act in good faith in performing its obligations under the contract and deal fairly with the other parties to the contract. The covenant of good faith and fair dealing protects the bargained-for terms of the agreement.

136.    Actions taken in bad faith or with an improper motive to destroy or injure the right of the other party to receive the benefits or reasonable expectations of the contract will breach the implied covenant.

137.    The above-referenced actions by Liker, among other actions, breached the covenant of good faith and fair dealing implied into the Consulting Agreement.

138.    As a result of Liker's Breaches, Frisch was and will continue to be damaged.

## COUNT SIX
### (Fraud in the Inducement)
### (as against Defendants Rivero and Findlater)

139.    Frisch incorporates by reference the allegations above as if fully stated here.

140.    Rivero and Findlater represented to Frisch that Rivero was authorized to issue membership interests in Liker in the Consulting Agreement.

141.    Rivero and Findlater's representations were material to Frisch's decision to enter into the Consulting Agreement.

142.    Rivero and Findlater knew or should have known that the representations were materially untrue at the time the representations were made.

143.    Rivero and Findlater participated in electronic and telephone communications with Frisch regarding the negotiations of the terms of the Consulting Agreement, including the promise in the Consulting Agreement to compensate Frisch by the issuance of equity interests in Liker.

144.    Rivero and Findlater's representations to Frisch concerning issuance of membership interests in Liker were false and/or, at a minimum, partial and/or ambiguous and gave rise to a duty to disclose additional information.

145.    Rivero and Findlater did not disclose to Frisch the May 28, 2019 Amended and Restated Limited Liability Company Agreement—or any prior operating agreement—which governed the issuance of new membership interests in Liker.

146.    Rivero and Findlater omitted from their discussion with Frisch that any additional steps were required in order to issue the relevant membership interests.

147.    Rivero and Findlater did not disclose to Frisch any other conditions relating to the issuance of the membership interests at all.

148.    Rivero and Findlater caused or permitted Frisch to believe that membership interest in Liker would automatically vest when earned as a result of their advance consent.

149.    Rivero and Findlater omitted to inform Frisch that, even though the Consulting Agreement stated Liker "will award Frisch preferred equity," both Rivero and Findlater retained the unilateral ability to prevent Liker from fulfilling that contractual promise by way of the terms of the undisclosed operating agreement.

150.    Rivero's and Findlater's false representations and/or omissions were material to Frisch's decision to enter into the Consulting Agreement.

151.    Rivero and Findlater both had superior knowledge, not available to Frisch, and knew that Frisch was operating on the basis of mistaken knowledge.

152.    Had Frisch known that Rivero and Findlater retained the unilateral ability to withhold his promised equity in Liker, he would not have entered into the Consulting Agreement and would not have performed consulting services for Liker.

153.    Rivero and Findlater knew or should have known that the omitted information was material to Frisch, and should have been disclosed to Frisch during discussions of issuance of equity in Liker to Frisch.

154.    Rivero and Findlater later deliberately and unilaterally exercised their rights in the undisclosed LLC Operating Agreement to cause Liker *not* to issue the promised equity to Frisch.

155.    Rivero and Findlater failed to disclose their unilateral ability to withhold the promised equity and, worse, continued to conceal the fact that they had not taken the secret additional steps necessary to issue the equity.  Instead, they actively treated Frisch as though he had, in fact, been awarded the equity in Liker required by the Consulting Agreement.  The additional concealment indicates that Rivero and Findlater had fraudulent intent all along.

156.    Rivero and Findlater made these false representations and omissions with the intention of inducing Frisch to enter into the relevant contracts and perform work for Liker.

157.    River and Findlater omitted material information from his discussions with Frisch with the intention of inducing Frisch to rely upon same to enter into the Consulting Agreement and perform work for Liker.

158.    Both Rivero and Findlater had a duty to disclose this omitted material information to Frisch.

159.    Both Rivero and Findlater had knowledge of the correct procedures for issuance of membership interests and that such Frisch was misled as to the same.

160.    Rivero imparted false information to Frisch and both Rivero and Findlater failed to discharge their duty to disclose to Frisch.

161.    Frisch justifiably relied on Rivero's representations, and on Rivero and Findlater's material omissions, in entering into the Consulting Agreement.

162.    Frisch justifiably relied on Rivero's representations, and on Rivero and Findlater's material omissions, in performing his obligations under the Consulting Agreement.

163.    Frisch has been damaged as a result of the fraudulent misrepresentations of fact and material omissions made by Rivero and Findlater in the inducement of the Consulting Agreement.

## COUNT SEVEN
### Fraudulent Transfer
### (Against Defendants Rivero, Liker and Tribel)

164.    Plaintiff incorporates by reference the allegations above as if fully stated here.

165.    Rivero, with the assistance of Liker, transferred Liker's intellectual property and other assets to Tribel with actual intent to hinder, delay, or defraud Liker's and Rivero's creditors.

166.    Rivero, with the assistance of Liker, transferred Liker's intellectual property and other assets to Tribel without receiving reasonably equivalent value in exchange for the transfers and at a time when Liker already owed Frisch a substantial amount of money and membership interests.

167.    Rivero, with the assistance of Liker, transferred Liker's assets to Tribel without receiving reasonably equivalent value in exchange for the transfer and during a time he believed or reasonably should have believed that Liker had incurred, or would incur, debts to Frisch beyond Liker's ability to pay as they became due.

168.    As a result, Frisch has been damaged insofar as he will be unable to collect his deferred compensation, and insofar as the value of his interests in Liker, once obtained, will be worth substantially less.

169.    Accordingly, Frisch is entitled to an order avoiding the transfers of Liker's assets to Tribel.

## COUNT EIGHT
### Successor Liability
### (Against Defendants Liker and Tribel)

170.    Plaintiff incorporates by reference the allegations above as if fully stated here.

171.    Tribel is the successor in interest to Liker, as a result of the *de facto* consolidation or merger of the two entities which occurred as a result of Liker transferring substantially all of its assets to Tribel.

172.    Alternatively, Tribel is the successor in interest to Liker because Tribel is a mere continuation of Liker, in that it uses the same assets and employees to operate in the same industry for the same purpose.

173.    Alternatively, Tribel is the successor in interest to Liker because any transaction between Liker and Tribel was entered into fraudulently to escape liability to Frisch.

174.    Based on the foregoing, Tribel is liable to Frisch for Liker's debt to Frisch as Liker's successor.

## COUNT NINE
### Alter Ego
### (as against Defendant Liker and Tribel)

175.    Frisch incorporates by reference the allegations above as if fully stated here.

176.    Tribel is the alter ego of Liker, because Liker transferred all or substantially all of its assets to Tribel (a then-newly-formed entity).

177.   Upon information and belief, Tribel is owned by the same or substantially the same people who own or owned Liker, including Findlater (and his entities) and Rivero.

178.   Tribel was established for no reason other than to avoid Liker's liabilities, including that owed to Frisch.

179.   Based on the foregoing, Tribel is liable to Frisch for Liker's debt to Frisch as Liker's alter ego.

## COUNT TEN
### Violation of the Freelance Isn't Free Act, NYC Admin. Code § 20-929
### (Against Defendants Liker and Rivero)

180.   Plaintiff incorporates by reference the allegations above as if fully stated here.

181.   At all relevant times, Liker and Rivero were hiring parties within the meaning of the Freelance Isn't Free Act ("FIFA").

182.   At all relevant times, Frisch was a freelance worker within the meaning of FIFA.

183.   Pursuant to § 20-929 of the New York City Administrative Code, a hiring party must pay the freelance worker the contracted compensation on or before the date such compensation is due under the terms of the contract.

184.   Liker and Rivero violated § 20-929 of the New York City Administrative Code by failing to pay Frisch in accordance with the Consulting Agreement.

185.   Under § 20-933(b)(3) of the New York City Administrative Code, hiring parties who violate § 20-929 are liable to the freelance worker in the amount of double damages, injunctive relief, and other remedies as may be appropriate.

186.   Frisch was a resident of New York City at the time when his wages were due from Liker and Rivero.

187.    Frisch was a resident of New York City at the time when he performed work under the Consulting Agreement for Liker and Rivero.

188.    By the foregoing reasons, Liker and Rivero are liable to Frisch in the amount to be determined at trial but no less than $705,000.00 (representing double damages through March 2, 2020), plus double damages for compensation through April 4, 2020, plus double damages for the equity compensation ($940,000-$1,880,000 or more), plus double damages for applicable tax gross-up, plus attorneys' fees, and any other damages permitted under FIFA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Frisch requests that this Court enter judgment against Defendants Rivero, FG Likeopedia, FG Investments, and Findlater, and in favor of Frisch, as follows:

A.    Entering judgment against all Defendants and in favor of Frisch on each and every cause of action herein;

B.    Entering an award of compensatory damages in an amount to be determined at trial but in no event less than $352,500.00 in consulting fees and $470,000 to $940,000 or such other currently higher value owed in relation to the value of the promised equity interests;

C.    Entering judgment against Defendants and in favor of Frisch in such additional amounts as are necessary pursuant to its indemnification to Frisch for all taxes associated with Liker's obligations to Frisch;

D.    Entering judgment enjoining Defendants from continuing to use Frisch's work product;

E.    Entering judgment against Defendants and in favor of Frisch for pre-judgment and post-judgment interest, double damages pursuant to relevant statutes and administrative rules, and the costs and attorneys' fees associated with bringing this action and the State Court Action;

F.     Entering judgment finding that Rivero and Findlater committed common-law and securities fraud in their dealings with Frisch and awarding compensatory and consequential damages, including the full amount of consulting fees and the value of the equity and tax gross-up obligations of Liker.

Dated: May 9, 2023

**NORRIS, McLAUGHLIN, P.A.**
*Attorneys for Plaintiffs*

By:  */s/ Nicholas A. Duston*
        Nicholas A. Duston, Esq.