UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STEVEN J. FRISCH,

                Plaintiff,

        - against -

LIKEOPEDIA, LLC, OMAR RIVERO, FG
LIKEOPEDIA, LLC, FG INVESTMENTS, LLC,
CHRISTOPHER FINDLATER, and TRIBEL, LLC,

                Defendants.

**23 Civ. 3904 (VM)**

**DECISION AND ORDER**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _08/26/24_

**VICTOR MARRERO, United States District Judge.**

    Plaintiff Steven J. Frisch ("Frisch") brings this action against defendants Omar Rivero ("Rivero"); Christopher Findlater ("Findlater" or, together with Rivero, the "Individual Defendants"); Likeopedia, LLC ("Liker"); FG Investments, LLC ("FG Investments"); FG Likeopedia, LLC ("FG Likeopedia"); and Tribel LLC ("Tribel" or, together with Liker, FG Investments, FG Likeopedia, and the Individual Defendants, "Defendants"). Frisch alleges violations of Section 10(b) of the Securities Exchange Act of 1934 (Count One and Count Two), violations of Section 20(a) of the Securities Exchange Act of 1934 (Count Three), breach of contract (Count Four), breach of the covenant of good faith and fair dealing (Count Five), common-law fraud in the inducement (Count Six), fraudulent transfer (Count Seven), successor liability (Count Eight), alter ego liability (Count

Nine), and violations of New York City's Freelance Isn't Free Act ("FIFA") (Count Ten).

Now pending before the Court is Defendants' motion to dismiss all causes of action alleged in the Complaint except for Count Four and Count Five. For the reasons set forth below, Defendants' motion to dismiss is hereby **GRANTED IN PART** and **DENIED IN PART.**

## I.    BACKGROUND[1]

This dispute concerns an arrangement between Frisch and Liker in which Frisch agreed to provide consulting services to Liker in exchange for a compensation package that included a 4.7 percent equity stake in Liker. The Complaint alleges that Frisch performed consulting work in satisfaction of the parties' agreement but that he never received any of the consideration owed to him. (See Dkt. 1 [hereinafter "Compl."].)

Liker is a limited liability company ("LLC") organized under Florida law that owns and operates an early-stage social media company. Rivero is Liker's manager and majority member. FG Investments and FG Likeopedia are also members of Liker

---

[1] Except as otherwise noted, the following background derives from the Complaint. The Court takes all facts alleged therein as true and construes the justifiable inferences arising therefrom in the light most favorable to the plaintiff, as required under the standard set forth in Section II below.

and are, in turn, controlled by Findlater. Tribel is purportedly an operating subsidiary of Liker and is the trade name for Liker's social media network. (See id. ¶¶ 1, 9-14, 94.)

Frisch began consulting for Liker in November 2019. Liker retained Frisch "to help [Liker] transform from a nascent startup company with a fledgling product into a functional and well-run operating company with an improved and fully developed product" and "to help Liker with its early-stage funding rounds and interactions with potential investors." (Id. ¶ 1.) Negotiations to formalize the parties' arrangement occurred in December 2019 and January 2020 — after Frisch had already begun consulting for Liker — and culminated in a written agreement (the "Consulting Agreement") executed by Frisch and Liker on January 6, 2020. Rivero and Findlater together negotiated with Frisch on behalf of Liker; Rivero signed the Consulting Agreement on behalf of Liker. (See Compl. ¶¶ 31, 35-37, 59 n.2.)

Frisch's compensation under the Consulting Agreement included the following components: a 4.7 percent equity stake in Liker, a deferred cash fee, and a seat on Liker's board of directors. (See Consulting Agreement, Ex. B. to Decl. of Nicholas A. Duston, Dkt. No. 29-2.) Concerning the equity stake, the Consulting Agreement simply promised that "Liker

will award Frisch preferred equity in an amount equal to 4.7% (four and seven tenths percent) of Liker on a fully diluted basis within 30 (thirty) days of executing this [Consulting Agreement]." (Id.) The Consulting Agreement did not contain any condition precedent or prerequisite for Frisch's equity to vest. (See Compl. ¶¶ 30-34.)

The Complaint alleges that, in phone calls and emails negotiating Frisch's equity compensation, Rivero and Findlater represented "that they had the authority and ability to promise, on behalf of Liker, that Liker will award Frisch preferred equity in Liker." (Compl. ¶ 38 (quotation marks omitted).) The Complaint further alleges that Rivero and Findlater never disclosed to Frisch the existence of Liker's Amended and Restated Limited Liability Company Agreement (the "LLC Agreement"), dated May 28, 2019, which did not authorize either Rivero or Findlater to unilaterally issue Liker equity but instead required approval by Liker's board of directors to admit new members and required any new members to agree to terms and conditions that the board of directors "determines to be necessary or appropriate." (Id. ¶ 54; see also id. ¶¶ 40-44, 52.)

Next, Frisch's cash fee was "$7,500 per day for each calendar day where Frisch performs work for Liker," with payment due monthly but "deferred until at least $500,000 in

funding is raised by Liker, at which point all deferred cash consulting fees will be paid to Frisch by Liker within seven calendar days of such funding." (Compl. ¶ 57 (alterations omitted).) The Consulting Agreement also contemplated that Liker would pay for any income taxes that Frisch might incur as a result of his work for Liker, which Frisch labels a "tax gross-up" at times in his Complaint. (Id. ¶ 69.) Frisch alleges that Liker received $1 million in funding in March or early April 2020, which triggered Liker's duty to pay the deferred cash fees to Frisch within seven days. Frisch alleges he worked at least forty-seven calendar days, purportedly entitling him to deferred fees of $325,000, plus indemnification for income taxes. (See id. ¶¶ 68-69.)

Finally, the Consulting Agreement contemplated that Frisch would "assume a seat on Liker's Board of Directors" once Liker had obtained a comprehensive liability insurance policy for directors and officers with certain specifications not relevant on the instant motion. (Id. ¶ 77.)

Frisch accepted the terms of the Consulting Agreement and rendered services to Liker as anticipated for several months. On April 4, 2020, Rivero called Frisch and indicated that Liker would not pay Frisch any of the deferred cash fees. From that day through the remainder of the term of the Consulting Agreement, i.e., until December 31, 2020, Liker

5

did not ask Frisch to perform any work. Frisch maintains, however, that he was available to perform consulting services on every day of that term. Frisch claims that he has not received any compensation to date for services rendered pursuant to the Consulting Agreement. (See Compl. ¶¶ 3, 5, 57-66.)

Frisch initially filed suit against Defendants in New York Supreme Court (the "State Court") on March 22, 2021 (the "State Court Action"). Frisch's allegations in the State Court Action were nearly identical to those he levied against Defendants here. On Defendants' motion to dismiss, the State Court sustained Frisch's common-law fraudulent inducement and FIFA claims but dismissed Frisch's securities fraud claims because of federal courts' exclusive jurisdiction to adjudicate disputes under the federal securities laws. (See Compl. ¶¶ 21-25.) See also Frisch v. Likeopedia, LLC, No. 651876/2021, 2023 WL 3319866, at *4 (Sup. Ct. N.Y. Cnty. May 8, 2023). On Frisch's motion, the State Court granted leave for Frisch to "discontinue" the State Court Action without prejudice so that Frisch could bring his federal- and state-law fraud claims to this Court to be adjudicated together. Id. Frisch thereafter filed his Complaint in federal court on May 9, 2023.

Following an exchange of pre-motion letters pursuant to this Court's Individual Practices (see Dkt. Nos. 17, 20, 22), Defendants jointly filed their motion to dismiss the Complaint (see Dkt. No. 26 [hereinafter "Motion"]) and an accompanying memorandum of law (see Dkt. No. 28 [hereinafter "Def. Mem."]). Frisch then filed a responsive memorandum of law (see Dkt. No. 31 [hereinafter "Pl. Mem."]), to which Defendants replied (see Dkt. No. 33 [hereinafter "Def. Reply Mem."]).

## II.  <u>LEGAL STANDARD</u>

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> In other words, a complaint should not be dismissed when the factual allegations sufficiently "raise a right to relief above the speculative level." <u>Twombly</u>, 550 U.S. at 555.

In determining whether a complaint states a claim that is plausible, courts must "give no effect to assertions of law or to legal conclusions couched as factual allegations,

but [must] accept as true the factual allegations of the complaint, and construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff." Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 185 (2d Cir. 2012) (citation, quotation marks, and alteration omitted); see Iqbal, 556 U.S. at 678.

"For claims based on misrepresentations or omissions, a plaintiff must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"). Commodity Futures Trading Comm'n v. Gorman, 587 F. Supp. 3d 24, 38 (S.D.N.Y. 2022). To satisfy Rule 9(b), a misrepresentation claim must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)).

### III. DISCUSSION

Defendants seek dismissal of every claim brought by Frisch except for Count Four (breach of contract) and Count Five (breach of the covenant of good faith and fair dealing).

A.   FEDERAL SECURITIES FRAUD CLAIMS

Frisch brings three claims for fraud under the federal securities laws: Count One against all Defendants for

violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 ("Rule 10b-5") promulgated thereunder; Count Two against Liker, FG Likeopedia, and FG Investments for violations of Section 10(b) and Rule 10b-5; and Count Three against Liker, FG Likeopedia, and FG Investments for violations of Section 20(a) of the Exchange Act. Defendants contend all three of these claims must fail because membership interests in Liker — an LLC — are not securities, as that term is defined by the Exchange Act. (See Def. Mem. at 9-18.) The Court does not agree.

1. Section 10(b)

"To state a claim under Rule 10b-5 for misrepresentations, a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 105 (2d Cir. 2007) (quoting Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005)); see 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. Defendants' sole argument to dismiss the Section 10(b) claims is that no purchase or sale

of securities has occurred because Liker's membership interests are not securities at all.

The Exchange Act's definition of a "security" does not expressly include LLC membership interests but does include any "investment contract." 15 U.S.C. § 78(c)(a)(10). Whether an LLC membership interest is a "security" for purposes of federal securities law turns on whether there has been (1) "an investment of money," (2) "in a common enterprise," (3) "with profits to come solely from the efforts of others." S.E.C. v. W.J. Howey Co., 328 U.S. 293, 301 (1946) ("Howey"); see Revak v. SEC Realty Corp., 18 F.3d 81, 87 (2d Cir. 1994). To constitute a security for purposes of the Exchange Act, the LLC membership interest must meet all three elements of the test set forth in Howey. See United States v. Leonard, 529 F.3d 83, 89 (2d Cir. 2008).

"[B]ecause of the sheer diversity of LLCs, membership interests therein resist categorical classification" and require "case-by-case analysis." Id. (quoting Reves v. Ernst & Young, 494 U.S. 56, 62 (1990)). "The Supreme Court has further asserted that in defining the term 'security,' 'form should be disregarded for substance and the emphasis should be on economic reality.'" Keith v. Black Diamond Advisors, Inc., 48 F. Supp. 2d 326, 332 (S.D.N.Y. 1999) (quoting Howey, 328 U.S. at 298-99). Considering the economic reality of the

agreement between Frisch and Liker, the Court easily concludes that the LLC membership interests promised to Frisch constitute securities for purposes of the Exchange Act.

Howey's first element — investment of money — does not require a literal cash payment but instead requires only "some tangible and definable consideration in return for the interest obtained." Black Diamond Advisors, 48 F. Supp. 2d at 332 (collecting cases). Frisch rendered consulting services to Liker in exchange for LLC membership interests. Frisch's work on at least forty-seven calendar days is tangible and definable consideration sufficient to satisfy Howey's investment requirement. Indeed, it is uncontroversial that "[e]mployment contracts promising shares as compensation are generally considered securities transactions within Rule 10b-5." Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993) (citing Dubin v. E.F. Hutton Grp. Inc., 695 F. Supp. 138, 146-47 (S.D.N.Y. 1988)); see also Roberts v. Bennaceur, 12 Civ. 1222, 2015 WL 1471889, at *19 (D. Conn. Mar. 31, 2015) (observing that "employment contracts promising shares of the employer company as compensation for

specific work, and not automatically provided to employees," may fall within the definition of a securities transaction).

Defendants' reliance on Int'l Brotherhood of Teamsters v. Daniel, 439 U.S. 551 (1979), is misguided. (See Def. Reply Mem. at 3.) Daniel considered whether a compulsory pension plan was an investment contract under the Howey test when employees were not required to make contributions out of their paychecks to be entitled to pension payments. 439 U.S. at 553. The pension payments, which employees may not have seen for years or decades, were just a small portion of the employees' total compensation; "[l]ooking at the economic realities," the Supreme Court observed that each employee was "selling his labor primarily to obtain a livelihood, not making an investment." Id. Daniel thus acknowledges that labor can be exchanged for securities, but that such an arrangement was not present in that case. See id.; see also GBJ Corp. v. Sequa Corp., 804 F. Supp. 564, 567-68 (S.D.N.Y. 1992) (citing Daniel for the notion that "a person's 'investment,' in order to meet the definition of an investment contract, need not take the form of cash only, but may consist of goods and services").

In contrast to the employees' pensions in Daniel, the membership interests in Liker here are alleged to constitute a relatively large portion of Frisch's total compensation.

Moreover, Frisch alleges that he agreed to a deferred and conditional cash consulting fee only if he received equity compensation around the time that his engagement with Liker began. (See Pl. Mem. at 13 (citing Compl. ¶ 57).) In other words, Frisch offered his services in exchange for an economic stake in Liker's future; this arrangement is an investment of money for purposes of the Howey test. See Yoder v. Orthomolecular Nutrition Institute, Inc., 751 F.2d 555, 558-59 (2d Cir. 1985)(concluding that common stock promised as compensation to prospective employees can be a securities transaction); see also Dubin, 695 F. Supp. at 142-43 (same).

Howey's second element is the existence of a common enterprise. 328 U.S. at 301. "A common enterprise within the meaning of Howey can be established by a showing of 'horizontal commonality': the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits." Revak, 18 F.3d at 87; see also Rocky Aspen Mgmt. 204 LLC v. Hanford Holdings LLC, 230 F. Supp. 3d 159, 165 (S.D.N.Y. 2017). The Complaint is somewhat barren on the details of what economic rights accompany a membership

interest in Liker, but the Court is satisfied that horizontal commonality is present in this case.

Both parties almost uniformly refer to the membership interests as "equity," which is commonly understood to be "[a]n ownership interest in property, esp[ecially] in a business" and is a term commonly used to describe a corporate entity's common shares, which are the quintessential form of a security. Equity, Black's Law Dictionary (12th ed. 2024); see id. ("A share in a public traded company."); Owner's Equity, Black's Law Dictionary (12th ed. 2024) ("The aggregate of the owners' financial interests in the assets of a business entity."); see also 15 U.S.C. § 78c(a)(11) (defining "equity security" as "any stock or similar security"). The Court can infer from the parties' language that, had Frisch received the membership interest he was promised, he would have become a partial owner of Liker, with rights similar to shareholders in a corporation. The value of such membership interests in Liker would rise and fall according to Liker's value as a business. (See Compl. ¶ 4.) Moreover, Liker has other investors whose fortunes rise and fall in the same way — for instance Rivero (whom the Complaint describes as Liker's "majority member"), FG Likeopedia, and FG Investments. (Compl. ¶¶ 10-13.) The Court is accordingly

satisfied that the Complaint adequately alleges the existence of a common enterprise.

The existence of a sizeable cash consulting fee does not change the Court's conclusion on the presence of a common enterprise. Defendants argue that Frisch's fortune would not "rise and fall together" with the fortunes of other investors because Frisch expected to receive sizeable cash consulting fees regardless of whether Liker equity grew to become valuable. (Def. Mem. at 14.) The Court is not persuaded that compensating an employee with both equity and cash means that the employee loses the protection of the federal securities laws with respect to the equity. In analogous circumstances where an employee's negotiated compensation package includes both cash and equity, courts have followed SEC guidance and held that "a sale of [securities] has occurred." Dubin, 695 F. Supp. at 146 (quoting Employee Benefits Plans, Securities Act Release No. 6188, 45 Fed. Reg. 8960, 8968 & n.84 (Feb. 11, 1980)); see also Mills, 12 F.3d at 1173, 1175-76 (receiving equity while reducing cash in a negotiated transaction amounted to securities transaction, but dismissing securities fraud claims on other grounds).

Howey's third element — an expectation of profits coming "solely from the efforts of others" — is likewise satisfied in this action. 328 U.S. at 301. The Second Circuit has held

that "the word 'solely' should not be construed as a literal limitation." Leonard, 529 F.3d at 88. Instead, "courts can (and should) look beyond the formal terms of a relationship to the reality of the parties' positions to evaluate whether 'the reasonable expectation was one of significant investor control.'" Id. at 85 (quoting SEC v. Aqua-Sonic Prods. Corp., 687 F.2d 577, 582 (2d Cir. 1982)). This is because the protections of the federal securities laws are critically important where an investor is "dependent on the promoter or on a third party for those essential managerial efforts which affect the failure or success of the enterprise." Aqua-Sonic Prods., 687 F.2d at 584. Drawing all reasonable inferences in Frisch's favor, the Court finds that his involvement in Liker was not so "meaningful" that he has moved outside the protection of federal securities laws.

The Complaint describes Frisch's role as twofold: (1) assisting Liker in raising investor funds, and (2) helping Liker "transform from a nascent startup company with a fledgling product into a functional and well-run operating company with an improved and fully developed product." (Compl. ¶ 1.) At the outset, the Court observes that the Complaint is silent as to whether Frisch's "transform[ation]" of Liker was to occur by virtue of Frisch's operational expertise or by facilitating access to outside funds. (Id.)

16

However, the Complaint does not describe Frisch as having any expertise in operating a technology company of Liker's ilk; nor does the Consulting Agreement itself mention any work unrelated to fundraising. The Court makes the reasonable inference in Frisch's favor, as it must at this stage in the litigation, that Frisch's role was to foster relationships with investors and not to take a major operational role in Liker's affairs. He thus depended largely on Rivero to operate Liker and generate a profit. See Aqua-Sonic Prods., 687 F.2d at 584.

Neither the 4.7 percent stake in Liker nor the seat on Liker's board of directors allegedly promised to Frisch compels a different conclusion. The Complaint is silent as to what governance or control rights might accompany such a small stake in Liker or a seat on the board of directors. After all, Liker is not organized as a corporation, but as a Florida LLC, which does not have a board of directors unless the LLC members agree to create and delegate authority to one. See Fla. Stat. §§ 605.0407, 605.04071 (vesting management authority over the business and affairs of an LLC to the members, unless the members specify otherwise). The parties

did not introduce the LLC Agreement into the record in this case.

Even without reviewing the LLC Agreement, which might have defined the governance rights formally available to Frisch, the Court "should look beyond the formal terms of a relationship to the reality of the parties' positions." Leonard, 529 F.3d at 85 (parentheses omitted). In Leonard, the Second Circuit examined an LLC's organizational documents and concluded that — notwithstanding the formal rights afforded to investors by those agreements — a jury had reasonably found that the investors took a passive role in managing the relevant companies, and therefore their membership interests were securities under the Howey test. 529 F.3d at 89-90.

Here, the Court does not have the benefit of reviewing the LLC Agreement or any record evidence, and its conclusion must rest solely on the events described in the Complaint, which must be assumed true. Critically, the Complaint describes Rivero acting as the "manager" and "majority member" of Liker. (Compl. ¶ 6.) It is difficult to imagine circumstances in which Frisch would be able to exercise any "meaningful control" over the company and its operations with control so centrally vested in a single person. Leonard, 529 F.3d at 88. Defendants offer no explanation otherwise.

Moreover, had Frisch exercised meaningful control over Liker, it is unlikely that he would have been frozen out of Liker in the way that he was: over the course of a single phone call with Rivero. (See Compl. ¶ 63.) Ending the parties' arrangement in this way is far more consistent with Frisch working as a contractor who received some equity as payment for sporadic work, rather than a partner in the business who could exercise control in his own right. However, it will be the parties' task in discovery to develop the record as to what Frisch's role was, in fact.

The cases Defendants cite for the opposite proposition pre-date the Second Circuit's choice in Leonard to "underscore" that courts must look beyond "legal formalisms" and examine the "economic realities" of the transaction. 529 F.3d at 585; cf. Black Diamond Advisors, Inc., 48 F. Supp. 2d at 333; Nelson v. Stahl, 173 F. Supp. 2d 153, 165 (S.D.N.Y. 2001); Robinson v. Glynn, 349 F.3d 166, 171 (4th Cir. 2003). Whatever logic there may be to those cases cited by Defendants, this Court is bound to follow Leonard.

In sum, the Court concludes that the Complaint describes a securities transaction sufficient to state a claim under Rule 10b-5. Though Defendants devote no discussion to the other elements of a securities fraud claim, the Complaint passes muster under the applicable federal pleading

standards: Defendants misrepresented (and omitted to disclose important limitations on) their authority to issue securities to Frisch, they knew that they had to obtain board approval before they could admit new members to the Liker business entity, Frisch relied on those misrepresentations and omissions, and Frisch suffered damages as a result thereof.[2] See ATSI Commc'ns, Inc., 497 F.3d at 99. Defendants' Motion to dismiss Count One and Count Two of the Complaint is therefore **DENIED**.

2. Section 20(a)

A claim under Section 20(a) of the Exchange Act has three elements: "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable participant' in the primary violation." Bogulavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998) (quoting SEC v. First Jersey Secs., Inc., 101 F.3d 1450, 1472 (1996)). Defendants draw attention to Frisch's puzzling (almost Kafka-esque) allegation that the Individual Defendants were controlled by their own LLCs, but Frisch explains that this

---

[2] The Court observes that Frisch has brought an unusual securities fraud case because he does not allege misrepresentations about the value of securities but rather the Defendants' intent to deliver the allegedly promised securities at all. Cf. Bridgestone/Firestone, Inc. v. Recovery Cred. Servs., Inc., 98 F.3d 13, 19-20 (2d Cir. 1996); Mills, 12 F.3d at 1175-76.

language is a typographical error. (See Pl. Mem. at 21 n.8.) Had Frisch pleaded that Rivero and Findlater were controlling persons over Liker, FG Likeopedia, and FG Investments — as he evidently intended — the Complaint would have stated a Section 20(a) claim. As already discussed, the Complaint pleads primary violations of Section 10(b). The Individual Defendants controlled Liker, FG Likeopedia, and FG Investments by way of their outright majority stake in those entities. The Individual Defendants were culpable participants in making the misrepresentations and omissions that violated the securities laws: They were the agents of their business entities and induced Frisch to perform work for Liker by way of the alleged fraud.

The Court, however, cannot rule on what Frisch says he intended to plead in the Complaint but must instead rule on the sufficiency of what the Complaint actually says. The Court therefore **GRANTS** Defendants' motion to dismiss Count Three of the Complaint without prejudice.

B. <u>COMMON-LAW FRAUDULENT INDUCEMENT</u>

Defendants next contend that Count Six of the Complaint — against the Individual Defendants for common-law fraud in the inducement — must be dismissed for failure to meet the particularity requirements of Rule 9(b) with respect to the Individual Defendants' alleged misstatements. To

satisfy Rule 9(b), a claim rooted in fraudulent misrepresentations must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Commodity Futures Trading Comm'n v. Gorman, 587 F. Supp. 3d 24, 38-39 (S.D.N.Y. 2022) (quoting Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004)).

The Complaint alleges that the two Individual Defendants represented "that they had the authority and ability to promise, on behalf of Liker, that Liker will award Frisch preferred equity in Liker" and that the Consulting Agreement warranted the same. (Compl. ¶¶ 38-39.) The Complaint attributes these statements to both Rivero and Findlater, and it alleges that they were made — by email and in telephone conversations — over the course of the parties' negotiations in December 2019 and the first week of January 2020. More granular particularity is not required; a fraud plaintiff need not plead exact dates nor quote exact language under Rule 9(b). See Internet Law Library, Inc. v. Southridge Cap. Mgmt. LLC, 223 F. Supp. 2d 474, 482 (S.D.N.Y. 2002) (declining to require plaintiff to plead the date and time of specific phone calls because "a two-month period is sufficiently circumscribed to satisfy the requirements of Rule 9(b)"); see

<u>also</u> <u>Pentacon BV v. Vanderhaegen</u>, 23 Civ. 2172, --- F. Supp. 3d ----, 2024 WL 1255992, at *18 (S.D.N.Y. Mar. 25, 2024) (declining to "require [p]laintiffs to specify the statements contained in" various phone calls and emails to satisfy Rule 9(b) (alterations and quotation marks omitted)); <u>Reynolds v. Lifewatch, Inc.</u>, 136 F. Supp. 3d 503, 523 (S.D.N.Y. 2015) (declining to require plaintiff to plead "the date and time that he received the alleged phone call and where he received the alleged phone call" to satisfy Rule 9(b) (emphasis and quotation marks omitted)). Accordingly, Defendants' motion to dismiss Count Six of the Complaint is **DENIED.**

C.    <u>FRAUDULENT TRANSFER, SUCCESSOR AND ALTER EGO LIABILITY</u>

The Complaint lists three claims relating to Tribel, the entity that Frisch alleges has assisted Liker in avoiding its obligations to him: Count Seven against Rivero, Liker, and Tribel for fraudulent transfer; Count Eight against Liker and Tribel for successor liability; and Count Nine against Liker and Tribel for alter ego liability. Defendants contend that these counts must be dismissed because Tribel does not exist as a separate entity. (<u>See</u> Def. Mem. at 20.)

Though Frisch has adequately pleaded that Tribel exists as a separate entity, Frisch concludes on information and belief that Liker's assets were transferred to Tribel and makes no factual allegations whatsoever to support that

conclusion. (See Compl. ¶¶ 91-106.) Nor has Frisch come close to alleging facts that would satisfy the elements of a fraudulent transfer, successor liability, or alter ego liability. Most noticeably, the Complaint lacks any factual allegations about the relationship between Liker and Tribel, whether Liker would have sufficient assets to satisfy a judgment in Frisch's favor, or whether Tribel was formed and funded with the intent to avoid Liker's creditors or otherwise defraud Frisch. These are important legal considerations for the types of liability that Frisch seeks to impose on Tribel. See, e.g., In re Nine West LBO Sec. Litig., 505 F. Supp. 3d 292, 319 (S.D.N.Y. 2020) (listing elements for fraudulent transfer); Lewis v. Blackman Plumbing Supply L.L.C., 51 F. Supp. 3d 289, 313-14 (S.D.N.Y. 2015) (listing factors relevant to successor liability); Kaplan v. Aspen Knolls Corp., 290 F. Supp. 2d 335, 340 (E.D.N.Y. 2003) (listing elements for alter ego liability); see also N.Y. Debt. & Cred. Law §§ 273, 274 (New York's enactment of the Uniform Voidable

Transactions Act, applicable to conduct on or after April 4, 2020).

Accordingly, Defendants' motion to dismiss Frisch's fraudulent transfer, successor, and alter ego liability claims is therefore **GRANTED** without prejudice.

D.    FIFA Claim

Count Ten of the Complaint alleges that Liker and Rivero violated Section 20-929(a) ("Section 929") of FIFA. See N.Y.C. Admin. Code § 20-929. "FIFA provides legal protections for freelance workers in New York City against nonpayment" or untimely payment for work performed. MJ Lilly Assocs., LLC v. Ovis Creative, LLC, 200 N.Y.S.3d 403, 405 (App. Div. 2d Dep't 2023). A FIFA action differs from an ordinary contract action in that it allows a plaintiff to recover double damages, injunctive relief, and reasonable attorneys' fees and costs from hiring parties who violate FIFA's substantive protections in certain circumstances. See N.Y.C. Admin. Code § 20-933(b)(3).

To qualify for FIFA's protection, Frisch must establish that he was a "freelance worker," which in turn is defined as "any natural person or any organization composed of no more than one natural person, whether or not incorporated or employing a trade name, that is hired or retained as an independent contractor by a hiring party to provide services

25

in exchange for compensation." Id. § 20-927; see also MJ Lilly
Assocs., 200 N.Y.S.3d at 405.

Frisch does indeed qualify for FIFA protections under
this definition. He entered into the Consulting Agreement as
one natural person, not part of a company or organization
with additional members or employees. The Consulting
Agreement describes Frisch as a contractor, rather than an
employee whose work would be subject to the company's plenary
control. See Bennett v. State Farm Fire & Cas. Co., 156
N.Y.S.3d 92, 96 (App. Div. 2d Dep't 2021) ("Broadly speaking,
an employee is someone who works for another subject to
substantial control, not only over the results produced but
also over the means used to produce the results. A person who
works for another subject to less extensive control is an
independent contractor."). Finally, Frisch provided services
to Liker and did so pursuant to an agreement to receive
compensation in the form of equity, deferred cash fees, and
a seat on Liker's board of directors. (See Consulting
Agreement at 1-2.) See also Frisch, 2023 WL 3319866, at *3
(finding that Frisch meets the definition of a "freelance
worker" under FIFA). Frisch is therefore a freelancer for the
purposes of his FIFA claim.

Rivero argues persuasively that there can be no FIFA
action against him personally because the Consulting

Agreement was formed between Frisch and Liker. (<u>See</u> Def. Mem. at 21-22.) Indeed, FIFA imposes obligations only on a "hiring party," and it was Liker — not Rivero himself — that hired Frisch. N.Y.C. Admin. Code § 20-929. (<u>See</u> <u>also</u> Consulting Agreement at 2.) Rivero's motion to dismiss this claim against him is therefore **GRANTED.**

Liker's policy arguments to avoid liability, however, are entirely unavailing. Whether Liker would meet the definition of a freelance worker is dubious[3] and, in any case, not relevant. Nor is it relevant that Liker finds Frisch's fees unaffordable now that Frisch has initiated litigation (with the prospect of double damages) to collect on what is owed to him. Liker's motion to dismiss this claim against it is therefore **DENIED.**

### IV.  <u>ORDER</u>

For the reasons stated above, it is hereby

**ORDERED** that the motion (Dkt. No. 26) (the "Motion") filed by defendants Omar Rivero ("Rivero"); Christopher Findlater ("Findlater"); Likeopedia, LLC ("Liker"); FG Investments, LLC ("FG Investments"); FG Likeopedia, LLC ("FG Likeopedia"); and Tribel LLC ("Tribel" or, together with Rivero, Findlater, Liker, FG Investments, and FG Likeopedia,

---

[3] Rivero and Findlater are both Liker members, so it seems that Liker is not an "organization composed of no more than one natural person." N.Y.C. Admin. Code § 20-927.

"Defendants") to dismiss the Complaint (Dkt. No. 1) (the "Complaint") of plaintiff Steven J. Frisch ("Frisch") pursuant to Federal Rule of Civil Procedure Rule 12(b)(6) ("Rule 12(b)(6)") is **DENIED** as to Count One; Count Two; and, with respect to Liker only, Count Ten; and it is further

 **ORDERED** that the Motion is **GRANTED** as to Count Three; Count Seven; Count Eight; Count Nine; and, with respect to Rivero only, Count Ten; and it is further

 **ORDERED** that Frisch is granted leave to file an amended Complaint not later than fourteen (14) days from the date of this Decision and Order; and it is further

 **ORDERED** that in the event Frisch does not timely file an amended Complaint, Defendants are directed to answer the surviving portions of the operative Complaint within twenty-eight (28) days of this Decision and Order.

 The Clerk of Court is respectfully directed to close the motion entered in this action at Dkt. No. 26.

**SO ORDERED.**

Dated: New York, New York
   26 August 2024

             _____
              Victor Marrero
                U.S.D.J.